BRYAN SCHRODER
United States Attorney

STEPHEN L. CORSO
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: Stephen.Corso@usdoj.gov

Attorney for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:18-cr-00109-TMB-DMS |
| | ) | |
| EDWIN ALLEN STOLTENBERG | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO STOLTENBERG'S SECOND
MOTION/SUPPLEMENT TO DISMISS WITH PREJUDICE (Dkts. 180 & 270)**

The United States of America opposes Mr. Stoltenberg's motion to dismiss the

indictment, which he filed on August 28, 2019, at Dkt. 180, and supplemented on

December 11, 2019, at Dkt. 270. (Dkts. 180 & 270.)   In the original motion, Stoltenberg

asserted three grounds for dismissal: (1) the "illegal" search of his car before the

government obtained a search warrant; (2) "taint" and "spoliation" of evidence with respect

to officers placing his wallet in his car following his arrest and his speculation that an FBI confidential informant (CI) burglarized his residence after his arrest; and (3) the so-called "interception" of phone calls that he made to attorneys from jail. (Dkt. 180.) Alternatively, Stoltenberg requested that the court suppress evidence on the same grounds. (*Id.*) In a second motion or supplement, Stoltenberg renews his effort to dismiss the indictment in light of recently obtained Securus jail call data. (Dkt. 270.) He also repeats his arguments in prior pleadings and hearings concerning his wallet, the sale of his car, the CI, and the affidavits supporting the two search warrants in the case, despite the fact that the data provides no additional information with respect to them. (*See Id.*)

The motion to dismiss (or suppress), even as supplemented, lacks merit.[1] Law enforcement agents and corrections officers inadvertently accessed Stoltenberg's attorney calls because the attorneys failed to register their phone numbers as private with the Alaska Department of Corrections (DOC).[2] Nevertheless, these calls were not privileged communications. They were monitored and recorded, and Stoltenberg and his attorneys knew that because an automated message at the start of each call warned them of such. Finally, Stoltenberg has not been prejudiced. No agent or corrections officer gleaned Stoltenberg's trial strategies from the calls, much less communicated them to the

---

1 The United States provides the following overview for the court prior to an evidentiary hearing on the matter. The facts in the overview are based on interviews of witnesses and review of records and documents. The United States expects to call these witnesses to testify, that they will testify to these fact, and that the documents and records will be admitted into evidence.

2 Standard DOC practice requires attorneys to fill out a form notifying DOC that their numbers should be listed as private and calls to it not be recorded. It appears that the attorneys whose calls were recorded in this case failed to follow this procedure.

prosecutors in the case. And no evidence was obtained in the case as a result of accessing these calls. The Securus data adds detail and alters the mix of information, but it does not change the conclusion that the government neither violated Stoltenberg's rights nor engaged in misconduct.

The data reflects that agents and corrections officers inadvertently accessed 30 non-privileged attorney calls, not 92, as suggested in Stoltenberg's supplement. Seventeen of these 30 calls were to Bradly Carlson, who Stoltenberg contacted in connection with the state proceedings that resulted in his June 26, 2018 arrest. Those proceedings are unrelated to the federal offenses alleged in the instant case. Moreover, the federal indictment in the instant case was not filed until well after Stoltenberg made these calls. Further, seven of the Carlson calls lasted around one minute, indicating that Stoltenberg was unable to reach him and that the call ended shortly after the automated warning played. The FBI copied only two of the Carlson calls; however, in both calls, Stoltenberg spoke to Carlson's receptionist and declined to leave a voicemail. The United States produced these two calls to Stoltenberg in October 2018. It also produced a spreadsheet reflecting 14 of the Carlson calls (including these two) at the same time.

Of the remaining thirteen attorney calls, twelve were to Danee Pontious, who represented Stoltenberg for about one week in the instant case. The United States identified nine of these twelve calls when it alerted the court to the jail call issue on August 2, 2019, and reported on it in subsequent months. These nine calls were produced to Stoltenberg in May 2019. Again, the United States has not listened to them, and it had these calls removed from the U.S. Attorney's Office's (USAO) discovery and network

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS            Page 3 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 3 of 20

systems. The final call is to Dunnington Babb of Cashion Gilmore. Similar to the Carlson calls, it occurred more than one month prior to the federal indictment. Along with the nine Pontious calls, the United States identified this call for the court, disclosed it in discovery, and had it wiped from the USAO's systems.

The Securus data is consistent with what the United States has reported to the court: The USAO came into possession of ten recorded attorney calls because Pontious and Babb failed to register their phone numbers as private with Securus. To the United States' knowledge, no one in the government intentionally pursued calls between Stoltenberg and attorneys. Again, the United States has not listened to the ten calls and does not believe that any USAO personnel have either. The FBI informed the United States that it had provided these calls to the USAO, and the United States promptly alerted the court. These calls are not privileged, and Stoltenberg's ability to defend against the charges has not been impacted. Notably, Stoltenberg has not claimed that privileged information related to this case existed in any call, nor that it was accessed and communicated to prosecutors. If it existed, he should have alerted the court to it by now. Accordingly, the motion and supplement are unavailing.

## I.    Statement of Anticipated Facts[3]

### A.    The Securus Jail Call System

As the court is aware, Stoltenberg was arrested on outstanding state warrants on the night of June 26, 2018, in the attic above his cousin Leon Bradford's apartment. Earlier

---

3 The United States will call witnesses and introduce evidence supporting the following factual contentions.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS         Page 4 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 4 of 20

that day, a CI tipped the FBI that Stoltenberg was driving to Valdez with one-half pound of methamphetamine. Consistent with the tip, Stoltenberg possessed and hid a large quantity of methamphetamine in the attic, and it remained there after his arrest. In an attempt to locate it, FBI TFOs Curtis Vik and Troy Clark began listening to Stoltenberg's jail calls because they believed that he would talk about where it was—and, in fact, he did. Based on those calls and other probable cause, the FBI obtained a warrant to search Bradford's apartment, where they recovered Stoltenberg's drugs. During the search, Bradford admitted that he had retrieved the methamphetamine and sold, used, bartered, or gave away a portion of it. TFO Vik, however, continued to access Stoltenberg's jail calls to listen for inconsistencies in Stoltenberg's claims concerning officers, including that they stole money from his wallet, which Stoltenberg has reiterated in prior hearings and pleadings.

In examining how and why the government accessed Stoltenberg's attorney calls, it is helpful to understand how the Securus system works and why jails contract to use it.[4] Securus is a private company that provides Voice Over Internet Protocol to corrections facilities throughout the United States, including the Alaska DOC. It tracks users' charges and records inmate calls. DOC officers typically access calls to secure and manage their facilities, including protecting inmates' safety, preventing contraband from being smuggled into jails, and keeping tabs on inmates.[5] Law enforcement officers listen to calls

---

4 The United States will call a witness from Securus to testify to the following facts concerning its platform.
5 However, in this case, a corrections officer at a Kenai facility who was familiar with Stoltenberg from prior periods of incarceration listened to calls in order to find evidence related to the instant

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS          Page 5 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 5 of 20

to investigate and solve crimes and to gather information.  Inmate calls can last up to 15 minutes and some, like Stoltenberg, make a lot of calls.  To save time, listeners often do not play entire calls but, instead, "spot check" by listening to portions of calls to determine whether an inmate is discussing relevant subjects.

Inmates, however, may place phone calls to attorneys that Securus does not monitor and record.  To do so, attorneys must verify with the DOC that they are attorneys,[6] and they must register their phone numbers as private with Securus.  Once attorney numbers are registered, calls to those numbers are not monitored and recorded (and the automated warning of such does not play), and the government is unable to access them.  But if attorneys do not register their numbers (and verify that they are attorneys), inmate calls to those numbers are monitored and recorded.  In such instances, an automated message warns inmates and attorneys that the calls are subject to being monitored and recorded. This warning process generally lasts more than 30 seconds and takes place before an inmate can begin conversing.   Such is the case with Stoltenberg's attorney calls.

Law enforcement agents and corrections officers generally access calls from computers in their offices.[7]  Information indicating that calls were made to attorney-registered numbers is visible on their screens, but they cannot access those calls. Conversely, a call to an unregistered number is accessible by clicking on a button on the

_____

case to pass on to investigators.
6 This procedure exists because inmates often attempt to disguise illegal activities as legally privileged communications, promoting criminal activity inside and outside the jail.
7 Streamlined access to jail calls is a relatively recent development.   Previously, investigators had to request jail calls from the DOC.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 6 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 6 of 20

screen. Such a call may be listened to in real time ("Live Monitored") or a recording of it may be played ("Recording Playback"). A call may also be saved to a folder on the Securus system ("Save to Rec Folder") and copied to a disk ("CD burning"). An unregistered call may also be downloaded to a computer and listened to.

Securus tracks these "access events." Thus, a call may be accessed multiple times in various ways by different agents and officers. For example, an agent may play a recorded call twice, save it to a folder, and copy it to a disk, a corrections officer may also play it, and a second agent may download it, resulting in six access events for a single call. With respect to Stoltenberg, he complains of 92 "access events" in his supplement but does not disclose in the supplement that they relate to 30 calls. (Dkt. 270.)

### B. Stoltenberg's Attorney Calls

<u>The Seventeen Carlson Calls</u>

Stoltenberg called Bradly Carlson 17 times between June 27, 2018, (the day following his arrest) and August 17, 2018. According to Securus, Carlson's phone number was not registered as private until on or around August 28, 2018. Stoltenberg made each of these calls before the indictment in the instant case was filed on September 20, 2018. (*See* Dkt. 2.) Because the indictment had not been filed, these calls most likely concerned Stoltenberg's state proceedings that resulted in his arrest. Further, while he was contacting Carlson, Stoltenberg made numerous calls to non-attorneys in which he bragged that he had not been caught with the drugs at Bradford's apartment, assured them that he would be released soon, was confident that he would serve state time on electronic monitoring, and that he was working with Carlson toward such ends.

Because Carlson failed to register his number, two FBI TFOs, Vik and Clark, accessed these 17 calls between June 27, 2018, and August 21, 2018, by playing at least a portion of each call. Vik and Clark were searching for the methamphetamine they believed that Stoltenberg possessed, and Vik continued to hunt for inconsistencies in Stoltenberg's statements about officers involved in his arrest. In addition, Vik saved two of these calls to a folder on the Securus system and copied these two calls to a disk. As a result, the FBI provided these two calls to the USAO in the normal course of discovery procedures. These two calls, however, are short and inconsequential: in both, Stoltenberg called to speak to Carlson, reached a receptionist, and declined to leave a voicemail.[8]

The United States produced these two calls to Stoltenberg in discovery on September 7, 2018, along with a spreadsheet prepared by FBI intern Sam McGraw identifying Stoltenberg's jail calls between June 27, 2018, and July 24, 2018. The spreadsheet includes references to 14 Carlson calls that occurred during this period, including the two that the FBI copied and provided to the USAO. In his notes in the spreadsheet, McGraw indicated that the 14 Carlson calls were not listened to, a legal call, or that Stoltenberg asked for someone, perhaps "Bradley?" [Sic], who was unavailable and declined to leave a voicemail. At no time have Vik or Clark relayed any substantive content from the 17 Carlson calls to the prosecutors in the instant case, nor did they obtain evidence in the case as a result. And Stoltenberg has not alleged that his attorney-client

---

[8] The United States acknowledges that it has listened to these two calls. The court should also note that several more of the 17 calls are similar to these two calls: They lasted around one minute, indicating that Stoltenberg did not speak to Carlson on these occasions either.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 8 of 20
         Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 8 of 20

privilege has been breached.

In addition to TFOs Vik and Clark, five DOC officers also played at least a portion of nine of these 17 calls between June 27, 2018, and July 13, 2018. Other than contacting several of them after receiving the Securus data to inquire about their access of Stoltenberg attorney calls,[9] the United States has had no contact with these corrections officers. Like the TFOs, they have not communicated any substantive content from these calls to the prosecution.

Lastly, there is one anomaly in the data with respect to Carlson. It suggests that a corrections officer live monitored a call from Stoltenberg to Carlson on December 21, 2018, at around 15:02, nearly four months after Carlson's number was finally registered as private. However, Securus believes that this was not the case. Instead, Securus believes that a corrections officer clicked on the play button to listen in but was unable to and received an error message to that effect. Securus is working to address this irregularity in its software.

<u>The Twelve Pontious Calls</u>

Like Carlson, Danee Pontious also failed to register her phone number as private.[10] According to Securus, Pontious's number was not registered as private until on or about July 3, 2019. As a result, the FBI accessed 12 calls that Stoltenberg placed to Pontious.

---

9 According to our review of the data, corrections officers played at least a portion of nine of the 17 Carlson calls.
10 The United States believes that Pontious may have had some confusion over whether her number was registered as private. Nevertheless, her number was not registered when Stoltenberg called her.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS          Page 9 of 20
          Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 9 of 20

The first nine of these calls occurred between September 27, 2018, and October 9, 2018, near the time Stoltenberg was indicted and arraigned in the instant case. Indeed, Pontious was Stoltenberg's attorney of record for about one week before she quickly moved to withdraw. Unlike the Carlson calls, the United States presumes that Stoltenberg contacted Pontious to discuss the instant case. TFO Vik began listening to at least a portion of those calls on September 28, 2018, and continued listening on October 1, October 2, October 9, and October 10. As was the case with the Carlson calls, Vik "spot-checked" the calls, including clicking play on a 14-minute call four times. On December 7, 2018, Vik saved the calls to a folder on the Securus system and then copied them to a CD.

Like the two Carlson calls, the FBI provided these nine Pontious calls to the USAO in the normal course of its discovery duties. The USAO loaded them into its discovery system and made them available to Stoltenberg in discovery on May 16, 2019.[11] Despite maintaining the calls in its system, the United States did not listen to any of the calls and does not believe that anyone in the USAO has either. Moreover, Vik does not appear to have learned anything from the calls, much less heard any defense strategy gleaned from these calls or communicated it to the prosecutors in the case. When the FBI notified the United States of these nine calls in summer 2019, the United States reported them to the court and had the USAO wipe them from its systems.

//

In addition to these nine Pontious calls, the FBI accessed three additional calls

---

11 Stand-by counsel Lance Wells signed for this discovery on July 16, 2019.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 10 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 10 of 20

Stoltenberg made to Pontious in the spring of 2019: May 15, May 22, and June 20. During this time period, Stoltenberg represented himself with Lance Wells as his stand-by counsel; therefore, Pontious was not his attorney of record. FBI Special Agent (SA) Daryl Allison downloaded the May 15 and May 22 calls to his desktop computer on May 18, 2019, and May 23, 2019, respectively, in connection with a separate criminal matter. Both the calls lasted about two minutes or less, thus the United States does not believe that anything substantive was discussed. Allison believes that he told someone in the USAO that he encountered an attorney call. Nevertheless, at no time has Allison heard or communicated any defense strategy gleaned from these calls to the prosecutors in the case.

FBI intern McGraw accessed these two calls plus a third call that Stoltenberg placed to Pontious on June 20, 2019. McGraw listened to a portion of the May 15, 2019 call on July 23, 2019, and saved it to a recording folder on the Securus system and copied it to a CD on August 1, 2019. He also saved the May 22 and June 20 calls to a recording folder on the Securus system and copied them to a CD twice on August 1, 2019. McGraw accessed all three of these calls as part of his review of Stoltenberg jail calls in summer 2019. He has never communicated any substantive information about Stoltenberg's discussions in these calls. The United States has not listened to these last three calls and does not believe that the USAO has ever possessed them.

The One Cashion Gilmore Call

Although Stoltenberg does not discuss this call in his supplement, the United States reminds the court that the FBI copied a recording of a call that Stoltenberg made to Dunnington Babb of Cashion Gilmore. Like Carlson and Pontious, Babb also failed to

register his number as private. The FBI provided this call to the USAO in the normal course of discovery, and the USAO loaded it into its systems and produced it to the defense along with the first nine Pontious calls. The United States did not listen to this call and believes that no one in the USAO has. The FBI identified this to the United States, and the United States reported it to the court and had it removed from the USAO's systems. Again, the United States expects that the foregoing facts will be established during an evidentiary hearing before the court.

## II.    Legal Analysis

### A.    The government did not violate Stoltenberg's right to counsel

The Sixth Amendment right to counsel attaches only once judicial proceedings have been initiated. *See Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (the right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"); *see also United States v. Hayes*, 231 F.3d 663, 666-67 (9th Cir. 2000) (en banc) (holding that no Sixth Amendment violation occurred where the government surreptitiously taped an interview between the defendant-suspect and co-conspirator informant nearly a year before the defendant's indictment); *United States v. Danielson*, 325 F.3d 1054, 1066 (9th Cir. 2003) ("[defendant's] Sixth Amendment right to counsel attached when the government initiated adversarial proceedings against him").

Once attached, a defendant's right to counsel is case and offense specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding that a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS          Page 12 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 12 of 20

attachment of his Sixth Amendment right to counsel on other charged offenses); *Anderson v. Alameida*, 397 F.3d 1175, 1180 (9th Cir. 2005) ("the right to counsel is case specific and attaches for the prosecution of particular alleged acts or events arising out of 'the same act or transaction'"). Accordingly, a defendant "ha[s] a right to counsel only on the offenses for which he ha[s] been indicted, and on any other offenses that constitute[ ] the 'same offense' under the *Blockburger* test." *United States v. Danielson*, 325 F.3d a1054, 1066 (9th Cir. 2003) (citing to *Texas v. Cobb*, 532 U.S. 162, 167-73 (2001); *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

To establish that an intrusion into the attorney-client relationship violated the Sixth Amendment, Stoltenberg must show, at a minimum, that the intrusion was purposeful, that defense strategy was communicated to the prosecution, or that the intrusion resulted in tainted evidence. *United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2004). The intrusion violates the Sixth Amendment only if it substantially prejudiced Stoltenberg, in that the United States used or otherwise gained an unfair advantage from the confidential information. *United States v. Danielson*, 325 F.3d 1054, 1069-70 (9th Cir. 2003).

Stoltenberg did not have a Sixth Amendment right to counsel in this case with respect to the calls he placed to Carlson and to Babb between June and August 2018 because it had not attached. The indictment was not filed until September 20, 2018, nearly three months after his arrest. Further, his calls to Carlson did not concern the instant case. Rather, Stoltenberg relayed to non-attorneys that Carlson was helping him with his state proceedings. Moreover, these state proceedings are separate and unrelated to the federal

drug and gun violations in the instant case.[12]

As for the first nine Pontious calls, they occurred after Stoltenberg's right to counsel attached. The government, however, did not purposefully access these nine calls. Instead, the FBI accessed them because Pontious failed to register her number as private. Moreover, Stoltenberg has not been prejudiced. The FBI did not impart any substantive information from the calls to the United States, and the United States has not used any such information to its advantage. And, as mentioned above, although it had these calls in its systems, the United States never listened to them. Further, the United States suspects that these calls are insignificant. While Stoltenberg has had the calls since July 2019, he has never alleged that anyone in the government gleaned sensitive information from them. The data adds detail, but it does not aid Stoltenberg's claim that the government violated his Sixth Amendment right to counsel.

To press his case, Stoltenberg relies on a Tenth Circuit habeas case, *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995), to argue that a purposeful intrusion into a defendant's Sixth Amendment rights without a legitimate justification for doing so supports his claim that his case should be dismissed. (Dkts. 180 at 18; 270 at 10.) That case is distinguishable. In *Shillinger*, a sheriff sat in on trial preparation sessions between the defendant and his attorney and reported back to the prosecution team regarding those preparations. *Shillinger*, 70 F.3d 1132. Thus, the information disclosed to the prosecution was sensitive defense strategy. *Id*. No such information has been disclosed in

---

12 The state proceedings appear to concern charges for giving false information and indecent exposure, failure to appear, and leaving an in-patient drug rehabilitation facility and absconding.

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS          Page 14 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 14 of 20

Stoltenberg's case.  Next, the court in *Shillinger* found that there was no legitimate law enforcement purpose for the intrusion in that case. *Id*. at 1141.  By contrast, Stoltenberg's attorney calls were accessed during the process of listening to recorded jail calls, a legitimate law enforcement exercise.

**B.     The jail calls to unregistered attorney numbers are not privileged**

A number of courts, including the Ninth Circuit, have concluded that a monitored line is not privileged. *United States v. Van Poyck*, 77 F.3d 285, 290-91 & n.9 (9th Cir. 1996) ("any expectation of privacy in outbound calls from prison is not objectively reasonable"; noting an exception only for "'properly placed' telephone calls between a defendant and his attorney, which the [jail] does not record or monitor"); *Watson v. Albin*, No. C-06-07767, 2008 WL 2079967, at *4-5 (N.D. Cal. May 12, 2008) (rejecting assertion of attorney-client privilege for calls placed on a monitored prison line); *United States v. Chaiban*, No. 2:06-cr-91, 2007 WL 437704, at *20-21 (D. Nev. Feb. 2, 2007) (magistrate report and recommendation) (the "decision to proceed with the conversations, despite notification the conversations were subject to being monitored and recorded, is no different from electing to proceed with these conversations notwithstanding the known presence of a third party"), adopted, 2007 WL 923585 (D. Nev. Mar. 23, 2007); *I Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine* ¶ 1.III.Element 3.F.4 ("the cases are all but unanimous that anything said on a recorded [jail] line vitiates any attachment of the privilege"); *see also United States v. Gonzalez-Betancourt*, 118 F. App'x 142, 146 (9th Cir. 2004) (non-precedential) (jail call from husband to wife not protected by marital privilege because the call was preceded by a recorded warning stating that it was

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 15 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 15 of 20

subject to monitoring and recording).

These courts are consistent with federal law, which generally construes the attorney-client privilege strictly. *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009).[13] The burden lies with the party claiming the privilege to prove each element of a "well-established eight-part test:"

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id*. at 607-08 (citations omitted).   In situations where an attorney-client communication contains a mix of privileged and non-privileged content, the privilege attaches to (a) the privileged portions of the communication and (b) the non-privileged portions of the communication only to the extent that those non-privileged communications directly or indirectly reveal privileged communications. *See United States v. Christensen*, 828 F.3d 763, 802-04 (9th Cir. 2015) (discussing partial redaction of a transcript of a recording that

---

13 "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). The attorney-client privilege does not extend to facts. U*pjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (privilege does not create a "broad zone of silence" over the subject matter of a communication); s*ee also I Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine* ¶ 1.III.Element 1.E.1 (5th ed. 2012). Nor does it protect information concerning the nature of an attorney's legal services, *see United States v. Cromer*, 483 F.2d 99, 101-02 (9th Cir. 1973); *I Epstein, supra*, ¶ 1.III.Element 1.E.3, the general nature of a particular attorney-client conversation, *see Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. C09-05897, 2011 WL 1599646, at *2 (N.D. Cal. April 27, 2011); cf. Fed. R. Civ. P. 26(b)(5)(A) 1993 Ad. Comm. Cmts., attorney-client communications that are unrelated to the provision of legal advice, *see United States v. Alexander*, 287 F.3d 811, 816-17 (9th Cir. 2002).

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS          Page 16 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 16 of 20

contained both privileged and non-privileged communications); *see also United States v. Chevron Corp.*, No. C 94-1885, 1996 WL 444597, at *2 (N.D. Cal. May 30, 1996) (court may conduct an *in camera* review to determine whether the attorney-client privilege applies to segregable portions of a communication).

Stoltenberg made the 30 calls at issue in this case to attorneys on monitored and recorded lines. None of these calls therefore are privileged. Even if the calls are privileged, Stoltenberg likely waived his privilege. An automated message at the beginning of the calls warned Stoltenberg and the attorneys that the calls were monitored and recorded. And Stoltenberg repeated to third parties what he had asked Carlson to assist him with: to be released on bail and placed on ankle-monitoring in connection with the state proceedings. In addition, it's not even clear that he had a privileged relationship with Carlson because it appears that he did not formally retain him in the state proceedings. The government, accordingly, has not violated Stoltenberg's attorney-client privilege.

### III.    Moving Forward

Appointing a special master remains unnecessary and disproportionate, even with the additional detail in the Securus data. The United States maintains that the overwhelming reason that the FBI and DOC officers accessed 30 of Stoltenberg's attorney calls is the failure of the attorneys to register their numbers as private. Again, there is no systemic effort in the District of Alaska to access calls between inmates and attorneys. As the court has noted previously, the USAO has taken steps to remedy and fix jail call issues. They include working with the Alaska Bar Association to notify defense attorneys of the procedures for registering their numbers, adding language to its standard discovery letter

advising attorneys to ensure that that their numbers as registered and reminding them how to do so, and issuing a new policy imposing restrictions on how and when agents may access jail calls. Nonetheless, the United States recognizes that government access—even unintentional and unknowing—to attorney calls is problematic and inflammatory given the value we place on privacy and basic rights and protections.

Even though Stoltenberg's legal claims fall well short, the United States proposes that it employ a filter attorney in the USAO to listen to the ten calls that the USAO had in its possession at one time. These are the ten calls the United States informed the court of in August 2019 and reported on in subsequent hearings and pleadings: the first nine Pontious calls and the one call to Dunnington Babb. Once the filter attorney listens to the calls and reviews for privilege and other legal issues, she will be able to apprise the court. But as stated previously, Stoltenberg has had these ten calls for months and has not alleged that they contain sensitive information, leading the United States to believe that they are legally insignificant.

Further, the United States believes that the court should hold an evidentiary hearing on the Stoltenberg jail call issue. In preparing this pleading and prior ones, and in reporting to the court orally, the United States has relied on information from the FBI, DOC, Securus, USAO personnel, and its own analysis of the calls to make factual representations to the court in good faith and to draw legal conclusions. Obviously, no witnesses have testified under direct examination or been subject to cross examination, and no exhibits have been offered and admitted into evidence. The United States nevertheless felt that reporting to the court was appropriate and responsive to the court's demands,

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                Page 18 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 18 of 20

knowing that Securus data and additional information would become part of the case. To resolve the issue and establish a record, the United States requests and is prepared for the court to conduct a full hearing in which the parties call witnesses, introduce exhibits, and make further arguments and credibility is evaluated.

Finally, the United States alerts the court that the Securus data is inconsistent with some prior facts that the United States has presented to the court. For example, the United States understood that the FBI first accessed a Stoltenberg jail call on June 28, 2018. But the data indicates that TFO Clark began listening to calls a day earlier. More significantly, the FBI accessed and listened to at least portions of more attorney calls than the United States previously understood and recognized. To the extent that the data and additional facts as they evolve contradict the United States' prior factual assertions to the court in these examples and in other ways, the United States corrects the record here and will continue to do so, including at the evidentiary hearing.

## IV. Conclusion

Stoltenberg's attempt to dismiss the indictment, or otherwise suppress evidence, is not well founded. His effort to use jail calls that he and the attorneys knew were not private to accuse the government of violating his rights and engaging in misconduct is not supported by fact or federal legal precedent. Moreover, Stoltenberg has yet to allege that the government gleaned sensitive information from the ten calls identified by the United States—or any attorney call—and used it to its advantage. Nevertheless, the United States requests an evidentiary hearing where it will call witnesses and offer exhibits to provide the court a complete record to support the government's opposition to the motion and

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 19 of 20
Case 3:18-cr-00109-TMB-MMS   Document 288   Filed 01/15/20   Page 19 of 20

supplement. After the court hears the evidence, the United States is confident that the court will conclude that the government did not violate Stoltenberg's rights or engage in misconduct in this case and deny the motion in full.

RESPECTFULLY SUBMITTED this 15th day of January, 2020, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/Stephen L Corso
STEPHEN L. CORSO
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2020, a
true and correct copy of the foregoing was
served via electronic mail on the following:

Gregory M. Heritage, Esq.
greg@heritagelawak.com

s/ Stephen L Corso
Assistant United States Attorney

U.S. v. Stoltenberg
3:18-cr-00109-TMB-MMS                    Page 20 of 20
Case 3:18-cr-00109-TMB-MMS    Document 288    Filed 01/15/20    Page 20 of 20